# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.: 4:15-CR-404-HEA-NAB-30 |
| vs. | ) |
| | ) |
| OSCAR DILLON, III, et al., | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT OSCAR DILLON III'S MOTION TO RECONSIDER THE DENIAL OF HIS MOTION FOR RELEASE AND RENEWED MOTION FOR RELEASE BASED UPON SERIOUS HEALTH CONCERNS DUE TO THE COVID-19 PANDEMIC

NOW COMES Defendant, OSCAR DILLON, III, by and through the undersigned attorneys, and respectfully moves this Honorable Court to reconsider its denial of Defendant Dillon's Motion for Release on Bond [Doc. 2534, 2561, respectively] and enter an order setting any and all reasonable conditions of release pending trial. Additionally, Defendant Dillon respectfully requests that this Honorable Court reconsider its order of detention due to serious health concerns posed due to the COVID-19 pandemic that were previously unknown at the time of his prior detention hearings.

**I.    OSCAR DILLON'S MOTION TO RECONSIDER THE DENIAL OF HIS MOTION FOR RELEASE ON BOND**

On February 17, 2020, Dillon filed his third motion for release on bond. [Doc. 2534]. The government filed its response in opposition on February 21, 2020. [Doc. 2538]. On March 13, 2020, this Honorable Court entered an Order denying Dillon's

motion for release on bond, and further denied a hearing on the matter. In so ruling, the Court held that Dillon had not identified information that was not known at the time of the earlier detention hearing – held on December 9, 2016 – that has a material bearing on the issues relevant to detention, namely, flight risk and safety of the community.

Dillon was charged in the instant case on December 1, 2016. The conduct of which he was later charged and acquitted in 17 CR 95, occurred on September 7, 2016. During his initial detention hearing, the government presented evidence – by way of proffer - regarding an impending ten-kilogram drug indictment against Dillon. See Doc. 828, p. 9 (Dillon's prior defense counsel filed a motion to reconsider the detention hearing, referencing the transcript of the December 9, 2016 proceedings). The Court most certainly considered the evidence presented during this proffer in determining whether Dillon presented a flight risk or danger to the community. On February 12, 2020, a jury of Dillon's peers, after hearing all of the evidence presented against him, which far exceeded the proffer presented to the Court during the detention hearing, found Dillon not-guilty of possession with the intent to distribute ten-kilograms of cocaine. The fact that a jury acquitted Dillon of that conduct after hearing **all the evidence**, was not previously known to the Court in determining whether detention was appropriate. Dillon's criminal history and pending criminal indictment in 17 CR 95 had a material bearing on whether he posed a flight risk or danger to the community. Absent a conviction in the 17 CR 95

2

case, Dillon has one prior criminal conviction from twenty (20) years ago that involved the mere possession of marijuana.

Moreover, contrary to the government's assertion, the fifth superseding indictment does not present a stronger basis for Dillon's continued detention. The charges against Dillon in the fifth superseding indictment are not based on any new evidence previously unknown to the government. In fact, at both detention hearings, the government proffered that it had evidence that Defendant Grady tampered with a witness. As the government concedes, there is no evidence that Dillon had anything to do with Defendant Grady relative to the new tampering count. [Doc. 2538, p. 3]. As there is no evidence that Dillon was ever involved with tampering with a witness, the government's argument that there is a stronger basis to find a risk of witness tampering if Dillon was released on bond – simply because Defendant Grady was charged with doing so – is entirely unfounded and unjustified. Additionally, the fifth superseding indictment does not allege that Dillon engaged in the trafficking of narcotics, violence, or the possession of any illegal weapon.

"18 U.S.C. § 3142(f) provides that detention hearings 'may be reopened before or after a determination by the judicial officer * * * if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.'" The new information concerning

3

the outright acquittal of Dillon in the 17 CR 95 – which was previously proffered to and considered by the Court in determining whether Dillon posed a flight risk or danger to the community - indicates that the proffer regarding the conduct that led to the charges in 17 CR 95 involved a crime he did not commit.

During the previous detention hearings, Dillon presented evidence of his extensive ties to the community, continued employment, and lack of any violent history. Recently, Dillon's family and friends submitted a multitude of letters to the Court in support of Dillon. The letters support the notion that, should he be released on bond, Dillon would be surrounded by those who are more than willing to ensure that he abides by any and all conditions of his release. Many of these individuals are willing to serve as third-party custodians.

The same facts and arguments that serve to rebut the presumption also refute the government's high burden to show by clear and convincing evidence that there are no combinations of conditions that could reasonably assure the safety of the community upon his release. A defendant cannot be detained "unless a finding is made that no release conditions will 'reasonably assure . . . the safety of the community'" and the defendant's appearance in court. 18 U.S.C. § 3142(e).

If this Honorable Court, after a hearing, were to order Dillon's release, a multitude of conditions would be available to the Court and agreeable to him, in addition to an order that he not commit another federal/state/local crime during release:

4

Dillon would be subject to the least restrictive further conditions or combination of conditions under § 3142(c)(1)(B), which could include, but not be limited to, the following:

1. Place Dillon in the custody of a third-party custodian, "who agrees to assume supervision and to report any violation of a release condition to the court";
2. Place of abode would be required to have a landline or wireless capabilities for purpose of the electronic monitoring device;
3. Restricted from using social media or any internet-capable device;
4. Maintain or actively seek employment and/or an educational program;
5. Follow restrictions on personal associations, place of abode, or travel;

For example, Defendant can be placed on home confinement, allowing for leave to travel only for medical emergencies, to meet with his attorneys, and to appear in court. There are no indications that Dillon has ever been placed on home confinement before and therefore, there is no evidence that confining him to his residence would not reasonably assure the safety of the community;

6. Report on a "regular basis" to pre-trial services;
7. No guns, destructive devices or other dangerous weapon;
8. Refrain from "excessive use of alcohol" and any use of drugs that are not prescribed; and
9. Any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community.

These proposed conditions must be considered before detention may be ordered. *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985). Conditions for release need not *guarantee* the safety of the community or a defendant's presence,

5

but need only "reasonably assure" both. 18 U.S.C. § 3143(e). *See United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985). A defendant need not show that release conditions will be the equivalent of jail; only that the conditions will reasonably assure his presence in court. *Kin-Hong v. United States,* 926 F.Supp. 1180 (D.Mass. 1996).

It is well settled that the provisions of the Bail Reform Act are to be narrowly construed in favor of release. *See,e.g., United States v. Singleton*, 182 F.3d 7, 23 (D.C. Cir. 1999); *United States v. Hinote*, 789 f.2d 1490, 1941 (11th Cir. 1986). The credible evidence in this case strongly demonstrates that there is a combination of conditions that can be fashioned which will reasonably assure the safety of the community as well his presence in court. *See* 18 U.S.C. §3142(e)(f). In light of the multitude of factors outlined above and the additional information not previously known or considered by this Court, Dillon respectfully asks this Honorable Court to reconsider the denial of his renewed motion to be released on bond and seeks a hearing on the same.

II. **OSCAR DILLON III'S RENEWED MOTION FOR RELEASE BASED UPON SERIOUS HEALTH CONCERNS DUE TO THE COVID-19 PANDEMIC**

To re-open a detention hearing or reconsider an order of detention a defendant must, first, "present[] information that was not known or available to him at the time of his original detention hearing, and then, second, show that such information is material to and has a substantial bearing on whether he should

6

remain detained." *United States v. Archambault*, 240 F. Supp. 2d 1082, 1084 (D.S.D. 2002).

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[1] The CDC has recently determined that, as of March 16, 2020 – ten days ago, the patients known to have been hospitalized in the United States - 18% were 45-54 years old[2]. Dillon is currently 46-years-old. Since his confinement, Dillon has suffered from chest pains, pre-hypertension blood pressure, and is suffering from a narrowing of his arteries caused by a low density protein level in his blood.[3] He is therefore a vulnerable victim of contracting COVID-19, especially if he were to remain detained in close proximity to hundreds of other inmates in federal custody.

Although undersigned counsel is sure the Court is aware of the seriousness of this pandemic, for reference, Dillon asserts that the following facts support a finding of exceptional circumstances warranting release. As of March 26, 2020, the new strain of coronavirus which causes COVID-19, has infected over 489,500 people, leading to at least 21,975 deaths worldwide.[4] On March 11, 2020, the World

---

[1] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.
[2] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm
[3] Undersigned counsel is in the process of collecting Dillon's medical records from the multiple facilities in which he has been detained since December 2016.
[4] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (March 12, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).

Health Organization officially classified COVID-19 as a pandemic.[5] Dillon is currently being held in the Randolph County Jail in Chester, Illinois. The Governor of Illinois, Governor Pritzker, declared a State of Emergency on March 9, 2020. On March 13, 2020, the President of the United States declared the COVID-19 outbreak a national emergency. On March 21, 2020, Governor Pritzker issued a stay-at-home Order for the entire State of Illinois that will stay in effect until at least April 7, 2020[6]. As of March 26, 2020, the total number of COVID-19 cases in the State of Illinois amounted to 2,538 and 26 fatalities.[7] With confirmed cases throughout most counties in Illinois that indicate community spread, we must take every necessary action to protect vulnerable populations, like those individuals who suffer from hypertension, and the community at large.

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[8] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is

---

[5] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[6] *Illinois Stay at Home Order Now in Effect*, NBC Chicago (March 21, 2020) at https://www.nbcchicago.com/news/local/illinois-stay-at-home-order-now-in-effect/2241919/
[7] http://www.dph.illinois.gov/topics-services/diseases-and-conditions/diseases-a-z-list/coronavirus
[8] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

8

limited in federal pretrial detention centers.[9] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[10] In China, for example, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[11] As of March 26, 2020, 17 detainees have tested positive in the Cook County Department of Corrections[12]. Dillon is currently detained in a county jail in Randolph County, he is not in a "somewhat more regulated" BOP facility. There is currently no indication from Randolph County Jail regarding what, if any, precautions the jail is taking to avoid the spread of COVID-19 in the facility. That being said, the St. Louis County State's Attorney's Office, the Public Defender's Office and the courts have worked together to release over 140 inmates from the

---

[9] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[11] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[12] *Cook County Jail Says 17 Inmates Have tested Positive for Coronavirus*, NBC Chicago (March 25, 2020) at https://www.nbcchicago.com/news/local/cook-county-jail-says-17-inmates-have-tested-positive-for-coronavirus/2244652/

county Justice Center in Clayton, in St. Louis County thereby acknowledging the serious concerns of spread in the jail system.[13] As of March 26, 2020, the total number of COVID-19 cases in the State of Missouri amounted to 502 with 8 fatalities.[14]

      This Court should consider the total harm and benefits to both prisoner and society that continued imprisonment of Dillon will yield, relative to the heightened health risks posed to Dillon during this rapidly encroaching pandemic. From Dillon's perspective his life—not only his liberty—is on the line, creating a powerful incentive to abide by any conditions of pre-trial release imposed by this Court. The safest place for Dillon to reside in wake of this pandemic, is at home with his family on home confinement. The fact that Dillon suffers from the aforementioned ailments makes him far more susceptible to contracting COVID-19 should he continued to be detained and confined to extremely small spaces with so many individuals living or working in close proximity to him. There is no evidence that Randolph County Jail would even have the capability to treat an exceptionally vulnerable inmate who contracts COVID-19.

---

[13] *St. Louis city and county to release more than 140 inmates amid virus concerns*, St. Louis Post-Dispatch (March 26, 2020) at https://www.stltoday.com/news/local/crime-and-courts/st-louis-city-and-county-to-release-more-than-inmates/article_dd8b30f6-c3ea-5229-b7ac-0aa36ee8f14c.html

[14] *Coronavirus Latest: Missouri tops 500 cases, Illinois reaches 2,500*, KMOV (March 26, 2020) at https://www.kmov.com/news/latest-info-on-coronavirus-in-st-louis/article_c6f6d3c4-6d23-11ea-8dbd-d300b9fa49c5.html

10

## CONCLUSION

Dillon respectfully submits that the combination of the aforementioned circumstances that were previously unknown and are material to the health and safety of Dillon's life, are exceptional and require consideration in determining whether he should be released, subject to strict conditions of release. For all the above and foregoing reasons, defendant Oscar Dillon, III respectfully moves, pursuant to 18 U.S.C. § 3142(b), (c), (A), (B), that this Honorable Court enter an order granting his motion for release, pending trial, under any such conditions as this Court deems appropriate.

Respectfully submitted,
s/    *Blaire C. Dalton*
*An Attorney for Oscar Dillon, III*

Blaire C. Dalton, ID #630569 IL
53 W. Jackson Blvd., Suite 1550
Chicago, IL 60604
847-373-4750
blairec.dalton@gmail.com

Vadim A. Glozman, ID # 6315389 IL
VADIM A. GLOZMAN LTD.
53 W. Jackson Blvd., Suite 1410
Chicago, IL 60604
312-726-9015
vg@glozmanlaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 26, 2020, a true and correct copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: all Attorneys of record.

                                                   s/     Blaire C. Dalton